No. 31,437

In re Accusation of J. P. Evans.

(29 P. 2d 1111.)

Opinion filed March 10, 1934.

*Roland Boynton*, attorney-general, and *Everett E. Steerman*, assistant attorney-general, for the plaintiff.

*J. P. Evans*, of Ulysses, *pro se*.

The opinion of the court was delivered by

HARVEY, J.: This is a disbarment proceeding. The members of the state board of law examiners, after considering complaints made to them, prepared and filed in this court an accusation in fifteen counts for the disbarment of J. P. Evans, an attorney at law of Ulysses, Kan. To these charges he filed a general denial. This court appointed A. M. Ebright, of Wichita, formerly judge of a district court in this state, as its commissioner to hear the evidence and report findings of fact and conclusions of law to this court. This has been done, and the board of law examiners has moved for

judgment of disbarment in harmony with the findings of the commissioner. The accused has filed a motion, with affidavits attached, to rerefer to the commissioner for additional evidence, which motion is hereby denied; but the affidavits, in so far as they relate to the complaints in the accusation, will be considered as evidence in addition to that presented to the commissioner.

Counts 1, 2, 3 and 4 of the accusation presented separate phases of the following matter: In 1927, or prior thereto, M. E. Hilleary, a traveling salesman for the Knorr-Schlaudt Wholesale Company of Hutchinson, severed his employment with that company and moved to Grant county, where he engaged in farming. At that time he was indebted to the Wholesale company for moneys advanced. The company sent the account to J. P. Evans for collection. After unsuccessful efforts to collect he advised that suit be brought, asked that $15 be sent for costs, and stated his fee would be "the regular commissions on all collected." The Wholesale company sent him $15 to deposit for costs and authorized him to bring suit. Evans converted this money to his own use, had his wife sign a cost bond, and brought the action against M. E. Hilleary and his wife. There appears to have been no justification for suing Mrs. Hilleary. Evans' explanation of that was that a judgment would be easier to collect if they went to switching property from one to the other. If that reason be good, he might have made all of Hilleary's relatives and friends defendants. No defense was made to the action, and judgment for $381.98 was taken for the Wholesale company against both defendants in October, 1927. In September, 1929, Hilleary paid all costs in the action and paid $199.90 on the judgment. Evans collected and kept that money. He reported a "partial payment," and that he had taken a note for the balance to be secured by a mortgage on a quarter section of wheat as soon as it was sown. No such mortgage was given. The note taken was payable to Evans, or jointly to him and the Wholesale company. Evans kept the note. Hilleary testified that when the costs and $199.90 were paid and he gave his note for the balance of the judgment there was no agreement that the note should be secured by a mortgage on the wheat crop, and that Evans agreed to release the judgment of record. The Wholesale company, being unable to get any returns, or any satisfactory explanation from Evans, employed another attorney, who took the matter up with Evans, attempting to get an adjustment, but was unable to do so. Our commissioner found, in brief,

that Evans wrongfully converted the $15 deposit for costs to his own use; that he wrongfully converted to his own use the $199.90; that he wrongfully kept and converted to his own use the note taken from Hilleary, and that he had no authority to take the note for the balance of the judgment, or to agree with Hilleary to release the judgment of record. We approve these findings. Evans also abused the process of the court by making Mrs. Hilleary a party defendant to the action. He falsely reported to the Wholesale company that the note was to be secured, when he had no agreement with Hilleary to secure it, and he agreed with Hilleary to release the judgment of record when he had no authority to do so, and apparently no intention to do so. In his motion to rerefer for additional evidence he says some further evidence can be adduced relating to these matters. At a hearing before the commissioner, when questions arose concerning these charges, he stated that he admitted all the charges made against him with respect to this matter except the charge that he had released the judgment of record. In view of these admissions there is no occasion to take additional testimony. After the accusation was filed in this proceeding, and some two or three weeks before testimony was taken on the accusation at Hutchinson, August 29, 1933, Evans made a settlement with the Wholesale company. While it was proper for him to make this settlement, the fact that he did so cannot excuse his professional derelictions regarding the matter for approximately five years.

Counts 5, 6 and 7 of the accusation relate to the following matters: In July, 1927, Oscar Johnson, claiming one Heiserman was indebted to him in the sum of $8.10, placed the claim in the hands of Evans, as his attorney, for collection. In the following August Johnson learned Evans had collected the money, but Evans asked for time to pay it, which was granted. In October Evans gave Johnson a check for $6.80, being the amount collected less his commission. The check was not good. Evans did not have funds in the bank sufficient to pay it. He was arrested, charged with giving a no-fund check. He was tried to a jury in the district court, found guilty, sentenced to pay a fine of $35 and costs and committed to jail. After being in jail several days he paid the fine and costs in full. In his motion to rerefer respondent presents the affidavit of Heiserman that he did not owe Johnson the $8.10, or any sum. Other affidavits on this point are presented. No reason is suggested why this evidence could not have been presented to our commissioner.

More than that, this case was tried out in the district court before a jury in respondent's home county. We have no disposition to retry it in this proceeding. In this connection respondent calls our attention to the fact that the legislature in 1933 (Laws 1933, ch. 71) repealed the statute which required this court to disbar an attorney adjudged guilty of an offense involving moral turpitude, and argues that this conviction is no ground for disbarment. While the court is no longer required by statute to disbar because of conviction, the law does not prohibit the court from taking that matter into consideration and determining whether or not an attorney should be disbarred, and certainly respondent's conduct in connection with this matter can only be characterized as reprehensible and unworthy of an attorney at law.

The eighth count in the accusation was that A. Laura McElhinny had placed with respondent several notes for collection; that he had collected one or more of the notes and failed to account to her for the moneys collected, and had failed to return to her on demand the uncollected notes. The commissioner found respondent had accounted for the moneys collected, but that he had failed to return to her the uncollected notes on her demand.

The board of law examiners offered no evidence in support of count No. 9 of the accusation, and it is properly dismissed.

The tenth count of the accusation relates to this matter: In 1930 one Loren Johnson, who was engaged in farming, was indebted to several laborers for harvesting a corn crop, which crop was heavily mortgaged to a bank. Two of the laborers talked with Evans about bringing suits against Johnson. It was charged in the accusation that Evans talked with Johnson, and they agreed that the suits might be brought for a much larger sum than was due the laborers, on the theory they had a harvester's lien superior to the mortgage of the bank, and that the money obtained on the judgment in excess of the sums due the laborers would be divided between Evans and Johnson, and to that extent defeat the mortgage. Our commissioner was unable to find that such an agreement existed, but did find that Evans brought the suits for the laborers for amounts "greatly in excess" of the sums due them.

The eleventh count in the accusation charged respondent with soliciting employment in a certain action. On controverted evidence the commissioner found for the respondent on this count. We approve the finding. In the motion to rerefer respondent seeks to

offer other evidence on this count. Since the finding is in his favor he needs no further evidence.

Counts 12, 13 and 14 of the accusation pertain to misconduct as an attorney, but not involving financial matters. In one of them it was found that he caused to have printed and used a letterhead as follows: "Evans & Evans, Attorneys," thereby representing that he was a member of a firm practicing law as partners, which was false, and that this was done for the purpose of soliciting people to employ him in the belief that he was a member of such firm.

Another count charged that in 1931 he was publisher and managing editor of a weekly newspaper at Ulysses; that on March 20 of that year he published and circulated in his paper an article that on a certain afternoon ten different persons consulted him about various legal matters, giving the names of the parties and the business concerning which they consulted him, conveying the idea that he was a busy lawyer whose services were much sought, thereby publishing to the world the private business affairs of his clients, and this was done for the purpose of inducing and soliciting others to employ him as their attorney.

Another count charged in effect that in the adjoining county of Hamilton a man and his wife had been charged with forgery of a certain check, or checks. The wife had been tried to a jury and found not guilty. The husband's case was to be tried. Evans had represented the wife in the trial. Shortly after the trial, and on February 27, 1931, he printed and published in his newspaper an article headed "The Forgery Case," in which he severely condemned counsel representing the prosecution and witnesses used by the prosecution, praised the trial judge, and commended the jury for its verdict, and prominently published the fact that he was the sole attorney for the defendant. Papers containing this article were sent from Ulysses, where they were published, into Hamilton county and delivered to a number of prospective jurors and other persons in that county for the purpose of affecting the views of those who might be called as jurors in the trial of the husband's case and for the purpose of advertising his ability as a lawyer. Conduct such as disclosed in these counts would not be engaged in by any reputable attorney, and the last one mentioned was designed to interfere with the due administration of justice.

The fifteenth count of the accusation has to do with J. P. Evans' relations as attorney for Mrs. Goldie Garr. Her former husband,

William A. Mitchell, was a world-war veteran and carried war-risk insurance. He died while they were living in Montgomery county and she was appointed administratrix of his estate. Thereafter she married Mr. Garr. In November, 1930, she employed Evans to obtain her former husband's war-risk insurance from the government and agreed to pay him ten per cent of the amount received for his services. He took the matter up with the United States Veterans Bureau and in the early winter of 1931 obtained for her from the government a draft for $7,280, of which sum she promptly paid him $728. Brothers and sisters and the mother of William A. Mitchell made claim to money, or part of it, on the ground that the mother had paid premiums on the insurance to the government. His estate in Montgomery county was reopened and Mrs. Garr was required to give a surety bond in the sum of $5,000. As a condition of signing the bond the surety company required that she deposit $5,000 in a trust company. This was done and certificates of deposit were issued. The balance of the proceeds of the draft from the government was delivered to Mrs. Garr. J. P. Evans continued to represent Mrs. Garr for the purpose of completing the administration of the estate. The claim of the other heirs was set for hearing in the probate court a number of times, and proper notice given, but Evans neglected, failed, or refused to appear, and at no time did he present the matter for Mrs. Garr before the probate court of Montgomery county. He had considerable correspondence with Mrs. Garr and attorneys representing the other heirs with respect to some sort of a settlement, and upon his recommendation Mrs. Garr employed an attorney from Oklahoma to assist in the matter, and that attorney for such services was allowed a fee by the probate court. Mrs. Garr executed an instrument authorizing Evans to settle the matter with the other heirs, with permission of the probate court, if the amount paid the other heirs and her attorneys' fees did not exceed fifty per cent. Before getting that authorization, however, Evans got the bonding company to authorize the trust company to release $500 of the money deposited with it on the representation that the money was to be used in the administration of the estate, and a little later got an additional $2,000 released upon his representation that the funds would be used in making partial distribution. At the time these representations were made there had been no order for the payment of claims, or for a partial distribution of the funds by the probate court of Mont-

gomery county, and no decision had been made determining heirship. The bonding company was not long in learning that it had released $2,500 in the trust company because of misrepresentations made to it by Evans, and called upon him to return the money. Soon thereafter, and in March, 1932, Evans caused to be prepared an agreement between attorney and client which purported to give him, as his attorney fee, one-half of the total amount collected from the government, $7,280, for representing her in the various matters connected with the litigation. This he mailed to Mrs. Garr on March 11, nearly two months after he had received the $2,500 from the trust company under the misrepresentations previously stated. Mrs. Garr did not execute the agreement promptly, but wrote to the government concerning the matter, and on April 14, 1932, Evans wrote her a letter in which he advised her to sign the agreement, and stated reasons why she should do so. The letter in part reads:

"The bond. Co. must make up *every dollar,* except fees allowed by court, court costs I've paid, and the fees to the bond. Co. That's *if we lose out.* That's why I wanted judge to allow me half of it now, regardless of how she finally decides it, & *before* she decides it. That way we could save half & the $500 fee allowed Miss K. & cost paid, & bond Co. fee, *losing less than half* that way.

"But, if we dont do that, then you & I can be sued by bond Co. to make up to it all we have used; & I'd have to pay back, or put my property in wife's name & be called a crook. I could never own anything, neither could you, if we didn't pay back."

There was other correspondence between Evans and Mrs. Garr relating to the signing of the agreement, which was to the same effect; that is, even if her claim to the fund was denied, Evans would turn over to her the amount allowed as attorneys' fees, and by that means she would at least get half of the total sum received from the government. Eventually, and on July 11, 1932, she signed the agreement. Our commissioner finds:

"This agreement was executed, not for the purpose of giving to the said J. P. Evans, as an attorney fee, half of the funds recovered from the government, but was, as he had advised her in the correspondence, executed for the purpose of protecting her and himself from paying back these funds to the trust company which he had secured the release of under misrepresentations to said bonding company, and to protect her from paying said sum of money over to the other heirs who were claiming this insurance money should the court find that they were the heirs."

We approve this finding. The probate court of Montgomery county gave notice of final settlement and notified Evans of the

date of hearing. He failed to appear and the matter was continued several times. Due to the fact that he did not appear Mrs. Garr employed Walter L. McVey, an attorney at law at Independence, to represent her in the final settlement of the estate, the determination of heirship, and to assist her in the recovery of money in the hands of Evans, as hereinbefore set out. On November 21, 1932, the hearing was had, Mr. McVey appearing for Mrs. Garr. A settlement was then agreed upon by which the other heirs would be paid $700 and withdraw further claim to the money. Mrs. Garr was adjudged to be the sole and only heir of William A. Mitchell, by the probate court. The matter of final accounting and settlement was then determined by the court, and Evans was ordered to pay into court $2,300, after the court had given him credit for all items he was legally entitled to. Evans presented to the court the written agreement above mentioned and claimed by reason of it he was entitled to the full amount of money which had been placed in his hands. After a hearing and full consideration the court refused to give the agreement that effect. No appeal was taken from the order, and judgment became final. Evans failed to pay the $2,300 into court and was cited for contempt. On the hearing of that citation his excuses were held to be without merit and he was committed to the custody of the sheriff to be placed in jail. He then agreed to acquiesce in the judgment and offered to pay the sum ordered by the court by giving his check at that time for $100 and to make specific future payments until the entire amount was paid, and upon this promise he was released from the custody of the sheriff. He returned to his home and immediately notified the probate court that it was useless to send the check for he had no money to pay it. Mrs. Garr is a woman who had very little education and no business experience, and she relied upon the advice of Evans in all matters pertaining to the securing of the funds from the government and the administration of the estate up until the time she employed Mr. McVey. The money which Evans secured from the trust company, above set out, was used by him in the payment of his personal obligations, without any authority from the probate court of Montgomery county or any express authorization of Mrs. Garr.

In his motion to rerefer respondent points out that he was not present at the hearing before the commissioner when evidence was taken in Montgomery county concerning his professional relations with Mrs. Garr and the William A. Mitchell estate. The record

discloses that testimony was taken August 10, 1933; that respondent had been notified of the time of hearing, and that he had written our commissioner that he would not be present, but consented to the hearing in his absence, as it would serve no useful purpose for him to be present. Thereafter the commissioner took testimony in this proceeding at Ulysses on August 31 and at Garden City on September 16. Respondent was present at both of those hearings and offered evidence at length in his own behalf as well as cross-examined witnesses presented by the board of law examiners. Our commissioner filed his report in this court on November 29, 1933, and the motion for judgment on the commissioner's findings was regularly set for hearing in this court for February 5, 1934. It was not until January 23, 1934, that respondent filed his supplemental motion to rerefer, with affidavits attached. In the various hearings before our commissioner he asked, and was granted, various delays in the proceeding. In short, his tactics throughout this proceeding have been dilatory and lacking in frankness with our commissioner and this court, and there is nothing in the affidavits attached to his motion tending to show that he has any real defense to the several accusations.

Without recapitulating respondent's derelictions it is clear from the statement heretofore made that he is unworthy to engage in the practice of law. It is by the court adjudged and ordered that he be disbarred from the practice of law in this state, and that his name be stricken from the roll of attorneys.